**Walsh v. Walsh**

C.P. of Lehigh County, no. 2010-FC-0328.

*Robert Davison,* for plaintiff.
*Melissa Rudas,* for defendant.

FORD, *J.,* December 29, 2010—Plaintiff, George M. Walsh (father), filed a complaint for custody on March 3, 2010. In it, he asks that he be made the primary physical custodian of the parties' two minor children. Defendant, Jasmin V. Walsh (Mother), who began participating in the case immediately after the filing of the complaint, asks that she be named the primary physical custodian.

The case proceeded to trial on December 9, 2010. I entered an order on December 17, 2010, wherein the parents were named joint legal custodians, mother was made the primary physical custodian of the children, and father was granted significant partial custody rights. In this opinion, I explain the reasons for the entry of the order.

### Findings of Fact

1. Father traveled to the Philippines in 1999. He met mother there. He brought her to the United States in that same year.

2. The parties were married on January 7, 2000. The parties' son, Chad C. Walsh, was born on December 13, 2000. The parties' second son, David C. Walsh, was born on March 12, 2002.

3. The parties' final separation occurred on February 1, 2010, when father told mother she had to leave the marital home in Slatington, Lehigh County. After mother resided with a few friends over a three month period, she moved

into a townhouse in Slatington where she still resides. Slatington is in the Northern Lehigh School District. Since the separation, father also moved from the marital home. He has resided in Coplay, Lehigh County, for about five months. Coplay is in the Whitehall Coplay School District. The parties' present homes are located ten to eleven miles from each other. Both homes are comfortable, safe, and properly suited for the children.

4. Father is 44 years old. He has a bachelor's degree. He has been employed throughout the marriage. He has worked for more than eight years as a corrections officer at the Northampton County Prison. He presently works the 10:00 p.m. to 6:00 a.m. shift, Monday through Friday, and every other weekend. His work schedule will change on January 9, 2011, when he will work the 6:00 a.m. to 2:00 p.m. shift.

5. Mother is 30 years old. Her skills in the English language are limited. She has less than a high school education. She did not work outside the home until she secured part-time employment in March of 2009. Mother, as the stay-at-home parent, primarily raised the children. Father, in addition to his steady employment, assisted in raising the boys. However, his routine when he would return home from night shift would be to spend several hours on the home computer, then sleep and then be available for the family.

6. Mother continues to work part-time selling jewelry at shows. This has required that she travel out of state for several days at a time each month. Mother anticipates that, from this point forward, she will have to travel about four days per month. That would be less than her previous

travel.

7. Through the years, both parents have regularly engaged in enjoyable and worthwhile activities with the boys, both in the marital home and beyond it.

8. Chad is a fourth grade student at Slatington Elementary School. He performs satisfactorily in his studies. In recent months, he has had problems with language skills and these problems are somewhat reflected in his grades. Both parents, during their respective times with Chad, are working with Chad to address these issues.

9. David is a third grade student at Slatington Elementary School. He is doing well academically.

10. Both children have spent all of their elementary school years in the Northern Lehigh School District with the last few years in Slatington Elementary School.

Both boys are adjusted to their school in Slatington and they are happy in that school.

They have a network of friends at school and in mother's neighborhood in Slatington. The boys have not formed any friendships with children who may live in father's Coplay neighborhood.

11. Without mother's permission, father attempted to enroll the boys in the Whitehall Coplay School District for the present academic year. When mother learned of this and objected, father filed a petition asking the court to permit him to enroll them. By order dated September 3, 2010, after hearing, the judge denied that petition. Since father first raised the subject of switching the boys'

school district, mother has objected to it and father has known that. In a web posting in late August, 2010, father wrote: "despite a last (sic) phone call from a mystery lady telling the school district not to do so, i (sic) got the boys registered for school today. I (sic) not allowed to say who made the phone call, but if your (sic) thinking nutty and just a bit slutty your (sic) on the right track."

12. Through an interim order that was entered on May 11, 2010, the parties have equally shared physical custody of the children with four exchanges of the boys between the two households during each repeating 14-day custody cycle. Mother lives in the same town as the children's school so attendance and promptness of the children have not been a problem when the children are in her custody. When it has been father's responsibility to get the children to school, he has been tardy with them on a few occasions but, despite the distance between his home and the school, he has done well on this topic. This shared custody schedule, with its frequent changes between the households is difficult for the parents and the children. At trial, neither party sought a continuation of shared physical custody.

13. Both parents love the children and the children love the parents.

14. Father lives within a five to ten minute drive from where his mother and sister reside. Father is emotionally close to his mother, Sharon Weber. She has assisted father at times in meeting the needs of the boys. Both she and father plan for her to move into father's home to assist in taking care of the boys during father's custodial periods.

15. Mother's family resides in the Philippines. Her family continues to be important to her. She talks with family members by phone regularly. Because of the distance, visits with her family are rare. Until approximately 2008 or 2009, mother had no significant friendships outside of the home.

16. Since mother's entry into the United States with father in 1999 through the date of trial on December 9, 2010, father has been unreasonably controlling of significant aspects of mother's life. Because mother was a stay-at-home mother, she relied upon Father for spending money. He refused her requests for money at times or sparingly gave it to her, usually in twenty dollar or thirty dollar increments. Mother expressed a desire to obtain a driver's license several times during the marriage and she attempted to educate herself on what was needed to obtain a learner's permit. Father did not encourage her to get a license. Father discarded her driver educational materials when he saw them around the house. Father set limits on the time that mother was permitted to be away from the marital home.

17. In 2008, father made mother leave the marital home. He placed her belongings in garbage bags which he left outside the home. The parties reconciled after that.

18. Since the parties' final separation in February, 2010, and before the agreed order of May 11, 2010, father has dictated when mother could see the children. Her time with them was limited by father to a few hours. He supervised each of these visits. They took place at locations that he designated. When father could not care for the boys because of work or other commitments, he

arranged for female acquaintances or his own mother to watch the children even though he knew that mother wanted custody time with them. Father gave mother three hours of visitation with the boys during Thanksgiving of 2010. Father denied mother any contact with the boys on Christmas day, 2009, but allowed the paternal grandmother to spend time with the children on that day.

19. Father refused mother two visits with the children between February and May, 2010, even though she traveled to the former marital home and asked to spend time with the boys when they were present, right there, in father's home.

20. At some point in 2009, mother made the decision that she did not have to be so isolated and, through the internet, she met a male by the name of Andy. That developed into a physical relationship which lasted until a date shortly before the December 9 trial. On occasions over the last year or two, mother has engaged in sexually explicit conversation over the Internet with a male or males. She has also sent sexually explicit images of herself to the male or males. (There is no competent proof that Chad or David read or saw any of these computer exchanges.)

21. During the marriage, father subscribed to pornographic magazines. He has left them laying about the marital home. On one occasion, several years ago, the boys saw and looked at the pages in one of the pornographic magazines. They joked about what they saw. When mother heard and saw this, she stopped it. When she brought this to the attention of father, his response was, "boys will be boys." Father discontinued his subscriptions to pornographic magazines several years ago.

22. When father became suspicious of mother's computer use, he applied a program to monitor her use of the computer. He discovered her written exchanges with the male(s). He also discovered the compromising images of mother that she sent over the computer. He had a confrontation with mother about these which led to the separation on February 1, 2010. Father also sent copies of the compromising images of mother to one of her family members in the Philippines and to acquaintances that mother had made in this area. Father took copies of mother's explicit email exchanges and the images of mother to Mrs. Tonya Smuts, one of mother's friends. He offered to show these to Mrs. Smuts who refused to look at them.

23. Mrs. Tonya Smuts resides with her husband and three children in Slatington. She has lived with her family for years in the same neighborhood where the parties lived before the separation. Her son, Travis Smuts, is Chad's schoolmate and best friend. Mrs. Smuts witnessed some of the events when father put mother out of the marital home in 2008. Outside the marital home, she saw the garbage bags with mother's belongings. Since that incident, mother and Tonya Smuts have developed a close friendship. Mother's present home, different from the marital residence, is located in the same neighborhood as Mrs. Smuts's home.

24. After father told mother on February 1, 2010, that she had to leave the home, mother stayed at two friends' homes and then, for three weeks in April, she stayed at the home of Mrs. Smuts. Mother gave father the addresses for each of these friends upon moving into their homes. Despite father's contention at trial that he had no idea

where mother was living since February 1, 2010, he knew where she was living at all times in 2010.

25. On April 22, 2010, after school, the boys went to Mrs. Smuts's home on their bicycles to play with her son, Travis. Mother, who then resided in the Smuts home, was present. Mrs. Smuts invited the boys to stay for dinner with her and their mother. The boys were excited about this. Mrs. Smuts called father who did not answer his phone. She left a message that the boys would be staying with her and their mother for dinner. She then went to the grocery store to buy things for dinner. While she was still at the store, father returned her call. He yelled at Mrs. Smuts and demanded that the children be brought home by 5:00 p.m. He asked who was with the children. Mrs. Smuts responded that it was Jasmin. He stated, "[H]ow dare you? You have no rights. I have a custody order." These statements were made by father before the entry of any custody order. Father also stated that he would make his own rules regarding custody. He would decide "where, when, how long; and only by appointment through him would Jasmin be able to see the boys."

26. On April 27, 2010, Chad and David came to Mrs. Smuts's home after 4:00 p.m. to play with Travis. Mother was still living in the Smuts home. Mrs. Smuts invited the boys to stay overnight in her home with mother. She intended to call father about this. Before she could call, Father came to her home and pounded on her door. He demanded to take the boys. Father tried to enter the Smuts home. Mrs. Smuts would not let him enter. Father screamed and used profanity directed at Jasmin. Among other things, he called her "f---ing whore." Chad, David, and the Smuts

children witnessed this incident. David cried and put his head under a pillow. Chad sat on a couch, shook and cried. Mrs. Smuts asked father to leave repeatedly. He stated that he was not leaving without the children. He asked Mrs. Smuts if she realized what a whore Jasmin is. Father continued to yell and use profanity despite requests by Mrs. Smuts to stop. Father remained on the Smuts porch while the other individuals were in the home. Mrs. Smuts called the police. When the police arrived, father asked them if they realized what mother was doing on the Internet and do they realize what a whore she is. Father then left the premises.

27. After the agreed order of May 11, father misrepresented activities that he had arranged with the boys to extend his custody time and lessen mother's time. There were other occasions when the children were told in advance by father or the paternal grandmother of attractive activities that they would be doing with the children but they would be done during mother's court-ordered custody time. This created expectations in the children. Mother was then confronted with the choice of allowing the children to do, during mother's court-ordered time, what they had been promised or giving up her own custody time. So as not to disappoint the boys, mother gave in.

## Discussion and Conclusions of Law

As the court and counsel recognize, the paramount consideration in a custody case is the best interests of the children. *McMillen v. McMillen*, 529 Pa. 198, 602 A.2d 845 (Pa. 1992). In my attempts to determine Chad Walsh and David Walsh's best interests, I considered "all factors which legitimately impact upon the child(ren)'s physical,

intellectual, moral and spiritual well-being...." *Zummo v. Zummo*, 574 A.2d 1130, 1137 (Pa. Super. 1990); see also *Arnold v. Arnold*, 847 A.2d 674, 677 (Pa. Super. 2004).

The best chance for the children's happiness and full development is to create a situation whereby the children will have an open and unfettered relationship with each parent. With all of their faults, each parent loves the children and the children love the parents.

With history and evaluation of the witnesses as the gauges, mother will support father's important place in the children's lives. She will do this no matter what custody schedule is established. Father will not do the same for mother. This was a significant consideration in the custody schedule created with the order of December 17, 2010.

Mother has materially contributed to the break-up of this marriage. She has done this through her affair with the man identified as Andy. (That was the only affair that was actually proven, not that only one affair is any less reprehensible.) She has also done this with her antics of exchanging sexually explicit Internet conversation and images with Andy and perhaps others. All of this began at some point in 2008. While mother was doing these things from the marital home, there is no evidence that the children were exposed to any of it.

Throughout the children's lives, mother has been their primary care-giver except for the period following the final separation on February 1, 2010, when father took over, very much against mother's wishes. That mother took care of the children well throughout their lives is undisputed. Since the restrictions that father placed on mother's contact with the children, especially since February 1, 2010,

mother has yearned to spend meaningful time with them. There were stretches, created by father, when she missed the children and the children missed her. She has proven herself to be a very good mother. There is no evidence that she ever denigrated father to the children. There is no evidence that she attempted to restrict the children's access to father. She acknowledged from the witness stand that the children love father. She acknowledged the love that the children have for the paternal grandmother too. I conclude from the evidence that she will continue to be supportive of father's important role in the children's lives. Mother was credible throughout her testimony and her testimony was supported, in large part, by the credible witness, Mrs. Smuts.

Father also materially contributed to the break-up of the marriage. A degree of social isolation and difficulty adjusting would be expected of a young person brought from the Philippines to a new life in America. However, father has engaged in a course of conduct that contributed to mother's isolation. He unreasonably controlled her. He stifled her opportunities to get a driver's license. He controlled the purse strings and was parsimonious in giving (and often refusing) the debit card and cash requests. He controlled her socially in terms of acquaintances and times to be away from the home. He expelled mother from the home in 2008 despite her language difficulties and her lack of acquaintances here. He did the same thing on February 1, 2010.

Once the final separation occurred, father dictated the times and circumstances under which mother could see the boys. Mother's visits with the boys were few and

contrived between February 1 and May 11, 2010, due to father's requirements for these visits. Father actually refused mother two visits with the children even though she traveled to the former marital home and asked to spend time with the boys when they were present, right there, in father's home. Under the shared custody order of May 11, father still managed to deprive mother of time granted to her as I have explained.

There is no hint in the testimony that mother ever denigrated father by word or action. Father has horribly denigrated mother. He has distributed her compromising emails and images to some of her friends here and to a family member in the Philippines.

He called her an "f---ing whore" in front of his children and then to the police. He referred to mother as "nutty" and "just a bit slutty" on Facebook. (See Exhibit D-2.)

Father has not been straightforward with Mrs. Smuts, mother, or the court. In believable testimony, Mrs. Smuts described how father told her that he had an order for physical custody of the children. That was not true at the time that he made that statement. Father's testimony that mother just took off for the three months from February until May, 2010, and that he did not know where she was living during that period of time was not believable. From Mrs. Smuts's testimony and mother's testimony, it is clear that father knew that mother was living with three different female friends over the course of that three months. Father was disingenuous in describing his unilateral enrollment of the children in the Whitehall Coplay School District. Father proposed to the court that the alleged lack of objection by mother to his enrolling the

children in Whitehall Coplay gave him the authorization from her to do that. The evidence establishes that mother did object to that enrollment and father knew it. In order to shorten mother's custody time, father was not honest with mother in describing arrangements he had made with the children. Father's stated reason for refusing mother unsupervised and limited visitation during the three months following the separation was that he was concerned about her Philippino contacts here and that she might abscond with the children. There was no evidence that mother had knowledge of anyone who could accomplish this or any other evidence that mother would abscond with the children. Father was not a credible witness.

For too many months, the children have been suffering from father's denying them a meaningful relationship with their mother. Chad, in particular, wants and needs to spend more time with mother. Both children need the time to be unrestricted by unreasonable controls that father has placed upon the mother-child relationship. Father's control of that relationship must end.

If father is made primary physical custodian, he will have added reason to arbitrarily control mother's relationship with the boys. Conversely, with mother as primary physical custodian, she will attempt to positively co-parent the boys with father. The setting is created for a healthy relationship among the four people involved in this custody case. The best interests of Chad and David require that mother be made primary physical custodian and that father be given meaningful partial physical custody, as I have done in the December 17 order.